O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LISA MARIE V.,<br><br>    Plaintiff,<br><br>  v.<br><br>ANDREW M. SAUL, Commissioner<br>of Social Security,[1]<br><br>    Defendant. | Case No. 8:18-cv-01809-KES<br><br>MEMORANDUM OPINION AND<br>ORDER |

**I.**

**BACKGROUND**

Plaintiff Lisa Marie V. ("Plaintiff") applied for Supplemental Security Income ("SSI") benefits in June 2014, alleging disability commencing November 7, 2013.  Administrative Record ("AR") 197-205.  On March 8, 2017, and September 26, 2017, an Administrative Law Judge ("ALJ") conducted hearings; at the first hearing, Plaintiff, who was represented by an attorney, appeared and testified, as did a vocational expert ("VE").  AR 32-70.  On October 27, 2017, the

---

[1] Andrew Saul is now the Commissioner of Social Security and is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d).

ALJ issued an unfavorable decision. AR 15-31. The ALJ found that Plaintiff suffered from the severe, medically determinable impairments of "bipolar disorder, not otherwise specified, with psychotic features; and polysubstance dependence, in remission; bilateral lower extremity edema; GERD [gastroesophageal reflux disease]; and musculoligamentous strain/sprain of cervical spine." AR 17. Despite these impairments, the ALJ found that Plaintiff had a residual functional capacity ("RFC") to perform medium work with the following mental restrictions: "limited to simple repetitive tasks; occasional interaction with supervisors; minimal interaction with coworkers and the public; ordinary stresses and changes; no high production quotas such as rapid assembly or other such high production jobs; and would miss work once every 30-45 days." AR 19.

Based on this RFC and the VE's testimony, the ALJ found that Plaintiff could work as an automatic machine attendant (Dictionary of Occupational Titles ["DOT"] 649.685-010), bench assembler (DOT 706.684-022), and laundry worker (DOT 361.685-018). AR 26. The ALJ concluded that Plaintiff was not disabled. AR 26-27.

## II.

## ISSUES PRESENTED

Issue One: Whether the ALJ properly considered the opinion of treating psychiatrist, Dr. Caitlin Pickart.

Issue Two: Whether the ALJ properly considered Plaintiff's subjective symptom testimony.

Issue Three: Whether the ALJ properly considered Plaintiff's Global Assessment of Functioning ("GAF") scores.

Issue Four: Whether the ALJ properly considered Plaintiff's edema. (Dkt. 22, Joint Stipulation ["JS"] at 2.)

In addition to these four issues, the Court invited the parties to submit supplemental briefing addressing (1) whether the VE's testimony that a person

2

with Plaintiff's RFC could work as an automatic machine attendant or bench assembler is inconsistent with the DOT due to the RFC's restriction against "rapid assembly" work, per <u>Randazzo v. Berryhill</u>, 725 F. App'x 446 (9th Cir. 2017), and (2) if any error in the ALJ's relying on the VE's testimony was harmless, because the availability of 70,000 laundry worker jobs nationally is sufficient. (Dkt. 24.) In response, Plaintiff did not contest that 70,000 jobs constitutes a "significant number" of jobs in the national economy. Instead, she argued that the laundry worker job is also inconsistent with the RFC's restriction against "rapid assembly or other such high production jobs." (Dkt. 25 at 4.) The Court therefore considers as a fifth issue:

<u>Issue Five</u>: Whether the ALJ erred in relying on the VE's testimony that a hypothetical person with Plaintiff's RFC could be a laundry worker.

**III.**

**DISCUSSION**

A. **ISSUE ONE: Dr. Pickart.**

Plaintiff contends that the ALJ erred by rejecting Dr. Pickart's opinions without addressing all the factors set forth in 20 C.F.R. § 404.1527(c) in his written decision. (JS at 3-4.) Plaintiff also contends that the ALJ failed to give legally sufficient reasons for rejecting Dr. Pickart's opinions. (JS at 5.) Finally, Plaintiff contends that the ALJ lacked substantial evidence to reject Dr. Pickart's opinions without developing the record by obtaining testimony from a medical expert ("ME"). (JS at 10.)

1. **Rules Governing the Evaluation of Medical Evidence.[2]**

"As a general rule, more weight should be given to the opinion of a treating

---

[2] On January 18, 2017, the SSA published the final rules "Revisions to Rules Regarding the Evaluation of Medical Evidence" in the Federal Register (82 FR 5844). These revised rules (which no longer give controlling weight to the uncontradicted opinions of treating physicians) apply to claims filed on or after

source than to the opinion of doctors who do not treat the claimant." <u>Turner v. Comm'r of SSA</u>, 613 F.3d 1217, 1222 (9th Cir. 2010) (citation omitted). This rule, however, is not absolute. "Where . . . a nontreating source's opinion contradicts that of the treating physician but is not based on independent clinical findings, or rests on clinical findings also considered by the treating physician, the opinion of the treating physician may be rejected only if the ALJ gives specific, legitimate reasons for doing so that are based on substantial evidence in the record." <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1041 (9th Cir. 1995) (citation omitted). Here, Plaintiff concedes that the opinion of Dr. Pickart was contradicted—e.g., by the opinion of a consultative examiner. (<u>See</u> JS at 2); <u>see also</u> AR 24 (ALJ discussing consultative psychiatric examiner's findings, including that Plaintiff was not significantly limited in ability to interact with coworkers or accept instructions from supervisors). Thus, the dispositive question is whether the ALJ gave "specific, legitimate reasons" for discounting Dr. Pickart's opinions.

### 2. Summary of Dr. Pickart's Opinions.

Dr. Pickart completed a "mental assessment" form describing Plaintiff's mental abilities and limitations. AR 662-66. Dr. Pickart opined that Plaintiff has many "moderately severe" and "severe" limitations, terms defined by the form as indicating "serious" and "extreme" functional impairments, respectively. <u>Id.</u> Most relevant here, Dr. Pickart found that Plaintiff was extremely impaired in her ability to work with others, interact appropriately with the public, accept instructions from supervisors, respond appropriately to changes, and work independently. <u>Id.</u>; <u>see also</u> AR 66 (Plaintiff's counsel's characterization of Dr. Pickart's opinions). The VE testified that if credited, Dr. Pickart's assessment would preclude all work. AR 65-66.

March 27, 2017, so they do not apply to Plaintiff's claim.

4

### 3. Analysis of Claimed Errors.

#### a. Failure to Recite 20 C.F.R. § 404.1527 Factors.

ALJs must weigh the medical evidence by considering factors such as (1) the nature of the relationship between the doctor and the patient (e.g., examining, treating, or other), (2) the length and nature of any treating relationship, (3) the degree to which the doctor "presents relevant evidence to support a medical opinion," (4) whether the opinion is consistent with "the record as a whole," (5) the doctor's specialization, and (6) "other factors," such as the doctor's familiarity with disability benefits programs. 20 C.F.R. § 404.1527(c).

Plaintiff cites <u>Trevizo v. Berryhill</u>, 871 F. 3d 664 (9th Cir. 2017), for the premise that ALJs must discuss in their written decisions each factor for each medical opinion. (JS at 3.) Plaintiff relies on the following language from <u>Trevizo</u>:

> [T]he ALJ erred by failing to apply the appropriate factors in determining the extent to which the opinion should be credited. Though she suggested that Dr. Galhotra's opinion was "inconsistent with the other substantial evidence in [Trevizo's] case record," such that it should not be given dispositive weight, 20 C.F.R. § 404.1527(c)(2), the ALJ did not consider factors such as the length of the treating relationship, the frequency of examination, the nature and extent of the treatment relationship, or the supportability of the opinion, <u>id.</u> § 404.1527(c)(2)-(6). *This failure alone constitutes reversible legal error.*

<u>Id.</u> (emphasis added).

Other courts considering this same argument have declined to interpret <u>Travizo</u> as establishing a new requirement for ALJ decisions. One district court persuasively reasoned as follows:

> Prior to <u>Trevizo</u>, the Ninth Circuit had never given any

indication that an ALJ was required to explicitly set forth in rote fashion an analysis of each of the 404.1527(c) factors.  See Hoffman v. Berryhill, No.: 16-cv-1976-JM-AGS, 2017 U.S. Dist. LEXIS 136353, *6, 2017 WL 3641881 (S.D. Cal Aug. 24, 2017) (adopted on 9/14/2017 at Hoffman v. Berryhill, No.: 16-cv-1976-JM-AGS, ECF No. 26).  ("In explaining his rejection of Dr. Kane's opinion, the ALJ did not explicitly analyze each of these § 404.1527(c) factors.  The Ninth Circuit has never expressly held that an ALJ should.").  …

The court concludes that it should not read into Trevizo a requirement that ALJs explicitly recite an analysis of each § 404.1527(c) factor in each of their decisions.  Rather, Trevizo requires that the record reflect that the ALJ actually considered and applied the appropriate factors.  A broader reading would be a significant departure from prior Ninth Circuit precedent and the Trevizo court gave no indication that it intended such a break.  Indeed, the Social Security regulations themselves do not express such a requirement and instead direct that the factors are to be considered.  See 20 C.F.R. § 404.1527(c) ("Unless we give a treating source's medical opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.").

Standen v. Berryhill, No. 2:16-cv-1267-EFB, 2017 U.S. Dist. LEXIS 156775, at *18-19 (E.D. Cal. Sep. 25, 2017).  The Standen court concluded that the record reflected "the appropriate factors were properly considered, even if all are not repeated in rote fashion."  Id. at *19-20.  While the Ninth Circuit recently vacated and remanded Standen on other grounds, the appellate court specifically agreed with Standen that the ALJ gave specific and legitimate reasons for rejecting the treating physician's opinion, in part because "ALJ's decision reflect[ed]

consideration of the <u>Trevizo</u> factors." <u>Standen v. Saul</u>, No. 17-17386, 2019 WL 3408893, at *1 (9th Cir. July 29, 2019).

Here, the record reflects that the ALJ knew about Dr. Pickart's specialization and treating relationship. In identifying records inconsistent with Dr. Pickart's mental assessment, the ALJ cited Exhibit 16F, page 13 (AR 25), a treating record signed by "Caitlin Pickart, M.D., Psychiatrist." AR 786. Plaintiff's counsel discussed Dr. Pickart's treating relationship with the ALJ at the hearing. AR 59-61. The ALJ's failure to discuss in his written opinion every § 404.1527 factor's applicability to Dr. Pickart's assessment is not legal error.

### b. Failure to Develop the Record.

When the ALJ finished questioning Plaintiff, the ALJ stated, "[H]ere's what I think[.] I need help with this. It looks like I need an expert witness and then you can cross-examine an expert witness." AR 58. Plaintiff's counsel argued that Plaintiff had low GAF scores and a work-preclusive opinion from her treating psychiatrist, suggesting that the record was already adequately developed to support a finding of disability. AR 58-62. The ALJ listened to this argument and responded, "okay." AR 62.

The ALJ has a duty to develop the record when it "is inadequate to allow for proper evaluation of the evidence." <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1150 (9th Cir. 2001). Plaintiff argues that in the above-quoted portion of the hearing transcript, the ALJ admitted that the record was inadequate without opinions from a ME. (JS at 10.)

The ALJ's comments during the hearing were not a final determination that the record was inadequate; the ALJ was entitled to conclude otherwise while finalizing his written decision. Plaintiff does not present any arguments other than the ALJ's tentative statement at the hearing as to why the record was inadequate. Plaintiff cites no cases finding the record inadequate based solely on similar statements by an ALJ during a hearing. Plaintiff has failed to demonstrate legal

error.

c. Failure to Give Specific, Legitimate Reasons Supported by
Substantial Evidence.

The ALJ gave Dr. Pickart's mental assessment form "little weight" for two reasons, finding it (1) inconsistent with the record as a whole and (2) expressed in "quite conclusory" terms. AR 25. These are legally sufficient reasons, if supported by substantial evidence. See Ghanim v. Colvin, 763 F.3d 1154, 1161 (9th Cir. 2014) (holding conflict with claimant's activities is a proper reason to reject a medical opinion); Batson v. Comm'r of SSA, 359 F.3d 1190, 1195 (9th Cir. 2004) ("[A]n ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole.").

i. Inconsistent with Other Evidence.

The ALJ found that Dr. Pickart's work-preclusive opinions were inconsistent with (1) findings from "generally unremarkable mental status examinations … as discussed above," and (2) Plaintiff's reports that she was "getting along well with others, enjoying school, and walking for exercise most days." AR 25, citing AR 784.

The ALJ had "discussed above" mental status exams ("MSEs") conducted in December 2013 (AR 558), April 2014 (AR 483-84), July 2014 (AR 622), August 2014 (AR 625), January 2015 (AR 643 and 647), April 2015 (AR 655), February 2016 (AR 519-21), and January 2017 (AR 765). AR 20-25. Those MSEs recorded Plaintiff's mental status as follows:

• December 2013: Plaintiff reported sometimes feeling the presence of a demon who talked to her, but "less and less over the past week." She was "linear and organized, more focused on back pain than anything else." She appeared "SL [slightly] anxious," but her anxiety was "decreased from last visit." Her speech was a rapid, affect congruent, thought process tangential, and insight and judgment limited. AR 558.

• <u>April 2014</u>: This was Plaintiff's next MSE after spending two months in jail after a lapse of sobriety. She was experiencing increased anxiety and irritability and received counseling on the effects of amphetamines. Her speech was rapid, mood anxious, affect congruent, thought process disorganized "but able to bring thoughts together with prompting," and insight and judgment limited. AR 483-84.

• <u>July 2014</u>: Plaintiff "continu[ed] to have mood swings and [was] quick to be angry." She reported depression and anxiety. She was "trying to repair her relationship with the rest of her family." Her speech was rapid, behavior slightly anxious, mood "up and down," thought process slightly disorganized, and insight and judgment limited. AR 621-22.

• <u>August 2014</u>: Plaintiff reported her moods as improved and "more stable." She was still experiencing "some" depression and anxiety, but "much less." She had graduated from Hope House, a 90-day rehabilitation center for people released from jail, and moved to Osha Kosh, a sober living house. Her speech was rapid, behavior slightly anxious, mood "much less depression and anxiety," thought process slightly disorganized, and insight and judgment limited. AR 624-25.

• <u>January 5, 2015</u>: Plaintiff reported seeing shadows and figures out of the corner of her eyes but not seeing spirits. Her mood was "pretty mellow except for the irritability." Her MSE was otherwise unchanged. AR 642-43.

• <u>January 26, 2015</u>: Plaintiff reported a positive response to Abilify, noticing that her "thoughts have become much more clear and are no longer racing." She "felt calmer without irritability or agitation." Her mood had improved, and she felt "hopeful" due to the new medication. Her behavior was "calm, cooperative, good eye contact, pleasant." She had normal speech, organized thought process, and limited insight and judgment. AR 647-48.

• <u>April 2015</u>: Plaintiff reported "doing fairly well in the past month." Her mood was "fine." Her MSE was otherwise unchanged from January 26, 2015. AR

655-56.

• <u>February 2016</u>: Plaintiff was cooperative, coherent, and organized. She made good eye contact with the interviewer. She had "appropriate" affect but displayed a "depressed and anxious" mood. She could perform basic cognitive tests. AR 519-21.

• <u>January 2017</u>: Plaintiff reported increased auditory and visual hallucinations when feeling stressed, but she completed her school finals. She reported a good mood and decreased anxiety. Her speech was clear and coherent, attitude friendly and cooperative, mood mildly anxious, affect constricted, thought process linear, logical, and organized, and judgment and insight intact. AR 764-65.

Regarding Plaintiff's school experience, in May 2016, Plaintiff reported that she was "doing well" but anxious about her housing. AR 784. Increased anxiety made her more irritable, but she endorsed stable moods, good use of coping skills, and good energy and motivation. <u>Id.</u> She was still hearing voices once or twice a week, but they were "easy to ignore." <u>Id.</u> She reported, "Getting along well with others; enjoying school; walking for exercise most days." <u>Id.</u>; <u>see also</u> AR 761 (in February 2016, reporting that she "is getting used to her school schedule;" she was encouraged to "go to the DMV and obtain a book that she can study before taking the test to get her license"); AR 744 (in March 2016, reporting "getting along well with others; enjoying school"), AR 780 (in April 2016, reporting "mild anx[iety] relating to taking tests at school or dealing with probation" but "reports good use of coping skills"); AR 799 (in September 2016, "excited for new semester of school because likes classes"); AR 807 (in October 2016, "[g]etting along well with others; enjoying social activities; enjoying current classes … walking daily for exercise and trying to eat healthy foods"); AR 812 (same in November 2016); AR 815 (same in December 2016); AR 768 (in December 2016, reporting, "Currently taking college classes at Santa Ana College. She has 2 semester[s] left

10

and she will graduate with her Associates in Liberal Arts and have certificate in Digital Recording."); AR 764 (in December 2016, reporting that she "completed her finals in school").

Substantial evidence supports the ALJ's finding that Dr. Pickart's extreme opinions are inconsistent with this evidence concerning Plaintiff's schooling and MSEs. None of Plaintiff's MSEs show that she has the degree of impaired social functioning as opined by Dr. Pickart. (AR 664.) Dr. Pickart opined that Plaintiff had serious or extreme limitations in many cognitive areas (AR 662-63), yet Plaintiff was able to pursue college coursework and take final exams. Dr. Pickart opined that Plaintiff had extreme limitations in accepting instructions and interacting appropriately with the public or her peers, opinions inconsistent with Plaintiff's ability to attend classes at Santa Ana College and go out in public to walk daily for exercise. Indeed, Dr. Pickart seemed to recognize this inconsistency by acknowledging that Plaintiff was "able to attend school" but still opining that Plaintiff would be "overwhelmed" by work-related stress. AR 666. The ALJ did not unreasonably interpret the evidence by concluding that if Plaintiff could manage school-related stress, then she could also manage the relatively low job-related stress associated with simple, unskilled work. See Dupre v. Berryhill, 765 F. App'x 258, 259 (9th Cir. 2019) (affirming ALJ's rejection of treating physician's opinion as inconsistent with "largely unremarkable" MSEs).

### ii. Lack of Support.

The ALJ characterized Dr. Pickart's mental assessment as "providing very little explanation of the evidence relied on in forming that opinion." AR 25. Plaintiff argues that Dr. Pickart's treating records provide the requisite support (JS at 9), but as discussed above, Dr. Pickart's treating records contain reports of Plaintiff's daily activities that are inconsistent with Dr. Pickart's mental assessment. Dr. Pickart's mental assessment is formatted as a check-the-box form with the only narrative portions describing Plaintiff's diagnoses and summarizing

her conclusions.  AR 662-66.  ALJs are entitled to give less weight to unexplained, check-the-box opinions.  Wennet v. Saul, No. 17-16118, 2019 U.S. App. LEXIS 19239, at *4 (9th Cir. June 27, 2019) ("Dr. Ward's treatment reports were check-the-box forms that provided no reasoning, and thus are entitled to little weight.").

## B. **ISSUE TWO: Plaintiff's Subjective Symptom Testimony.**

### 1. **Rules for Evaluating Subjective Symptom Testimony.**

It is the ALJ's role to evaluate the claimant's testimony regarding subjective pain or symptoms.  See Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012).[3] "[T]he ALJ is not required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)."  Id. at 1112.  An ALJ's assessment of symptom severity is entitled to "great weight."  Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989).

If an individual alleges impairment-related symptoms, the ALJ must evaluate those symptoms using a two-step process.  First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged.  Treichler v. Comm'r of SSA, 775 F.3d 1090, 1102 (9th Cir. 2014).  If so, the ALJ may not reject a claimant's testimony "simply because there is no showing that the impairment can reasonably produce the degree of symptom

---

[3] On March 24, 2016, the SSA published Social Security Ruling 16-3p, 2016 SSR LEXIS 4 ("SSR 16-3p"), which eliminated use of the term "credibility" from SSA sub-regulatory policy.  SSR 16-3p was republished on October 25, 2017 with the revision that the ruling was "applicable on March 28, 2016."  See 82 Fed. Reg. 49462, 49468 & n.27 (Oct. 25, 2017).  Here, the ALJ issued his opinion in October 2017, such that SSR 16-3p was in effect.  The Ninth Circuit has noted that SSR 16-3p is consistent with its prior precedent.  Trevizo v. Berryhill, 871 F.3d 664, 678 n.5 (9th Cir. 2017) (SSR 16-3p "makes clear what [Ninth Circuit] precedent already required").  Accordingly, citation to earlier case law is appropriate.

12

alleged." Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996).

Second, if the claimant meets the first test, the ALJ may discredit the claimant's subjective symptom testimony only upon making specific findings that support the conclusion. Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010). If the ALJ finds testimony as to the severity of a claimant's pain and impairments is unreliable, then the ALJ must make findings "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." Thomas v. Barnhart, 278 F.3d 947, 958 (9th Cir. 2002); Brown-Hunter v. Colvin, 806 F.3d 487, 493 (9th Cir. 2015). Absent a finding or affirmative evidence of malingering, the ALJ must provide "clear and convincing" reasons for rejecting the claimant's testimony. Ghanim v. Colvin, 763 F.3d 1154, 1163 & n.9 (9th Cir. 2014).

In assessing the intensity and persistence of symptoms, the ALJ must consider a claimant's work record, observations of medical providers and third parties with knowledge of claimant's limitations, aggravating factors, functional restrictions caused by symptoms, effects of medication, and the claimant's daily activities. Smolen, 80 F.3d at 1283-84 & n.8; SSR 16-3p, 2016 SSR LEXIS 4, at *10 ("[The Commissioner] examine[s] the entire case record, including the objective medical evidence; an individual's statements …; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record."). ALJs may also consider inconsistency in the claimant's statements. Ghanim, 763 F.3d at 1163; SSR 16-3p, 2016 SSR LEXIS 4, at *21 ("[The Commissioner] will compare statements an individual makes in connection with the individual's claim for disability benefits with any existing statements the individual made under other circumstances.").

If the ALJ's findings are supported by substantial evidence in the record, courts may not engage in second-guessing. Thomas, 278 F.3d at 959.

## 2. Summary of Plaintiff's Subjective Symptom Testimony.

Plaintiff testified that she is unable to work because of schizoaffective disorder, posttraumatic stress disorder, and hallucinations. AR 54. She wrote, "When I'm in public I see things that aren't there and I hear animals, insects, and trees talking and singing to me. I have extremely bad panic attacks that … cause me to hallucinate. I get easily irritated when people get too close to me and sometimes that causes me not to be able to speak." AR 230.

## 3. The ALJ's Evaluation of Plaintiff's Testimony.

The ALJ found that Plaintiff's testimony "concerning the intensity, persistence and limiting effect of [her] symptoms [was] not entirely consistent with the medical evidence and other evidence in the record.…" AR 24. As supporting reasons, the ALJ cited Plaintiff's (1) limited treatment history and (2) sporadic work history before her claimed date of impairment. AR 24. The ALJ also (3) contrasted Plaintiff's reported activities with her claimed dysfunction.[4] AR 18-19.

Reason One: The ALJ characterized Plaintiff's mental health treatment history as "less comprehensive than one would expect for a totally disabled individual." AR 24. While true, one cannot reasonably infer that Plaintiff received sporadic mental health treatment because her condition was not serious. Rather, the record reflects an unstable childhood, insurance issues, relationship issues, drug abuse, and repeated arrests. AR 55-56, 484, 493, 507, 516-19, 531. These are equally likely to have caused her to receive spotty mental health treatment.

---

[4] Plaintiff argues that this attributes reasoning "post hoc" to the ALJ. (JS at 34.) The Court disagrees. That the reasoning appeared in a different part of the opinion does not mean that the ALJ did not discount Plaintiff's testimony due to the identified inconsistencies. See, e.g., AR 18 ("The claimant alleged she has difficulty concentrating. However, the claimant has enough concentration to perform household chores, pay bills, and use public transportation.").

Plaintiff's poor mental health may also have caused gaps in her treatment. Plaintiff reported that she has been "on and off" psychotropic medication since the age of 33. AR 492. She would "stay on medication when she was in jail" or rehab, but "once let out she did not follow up." Id. Plaintiff recognized, "I do well for a while and then I stop medication and I end up back on the street." Id.

Reason Two: ALJs may consider a claimant's work history when assessing his/her testimony. See Sherman v. Colvin, 582 F. App'x 745, 748 (9th Cir. 2014). Plaintiff testified that she has never held long-term employment. AR 54. About 15 years earlier, she worked for a few months as a telemarketer. AR 53-54. Again, however, the socioeconomic facts discussed above, rather than a lack of motivation to work, appear equally likely to have caused this.

Reason Three: The ALJ noted that Plaintiff "was living in a sober living facility with other women. She goes to group classes. She is able to go out alone." AR 18. Plaintiff could interact with medical staff cooperatively and reported getting along well with others and enjoying school. Id. She could ride the bus and do her own shopping. AR 19.

These notations are supported by the record. See, e.g., AR 518 (Plaintiff lived in sober living house with other women[5]); AR 519 (Plaintiff took the bus to WIT [Whatever It Takes] Telecare Center to attend therapy and group classes and went other places alone; she did her own shopping); AR 784 (she reported getting along with others and enjoying college classes); AR 768 (she was on track to graduate with an associate's certificate from Santa Ana College).

The ALJ did not unreasonably interpret the evidence by finding that Plaintiff's ability to go out alone in pubic, attend group therapy classes, live in a group setting, interact cooperatively with medical staff, and successfully take college classes was inconsistent with her testimony that going out in public triggers

---

[5] In July 2016, Plaintiff moved into her own studio apartment. AR 69, 795.

15

panic attacks and an inability to speak.  Inconsistency with Plaintiff's reported activities thus provides a clear and convincing reason supported by substantial evidence for discounting Plaintiff's subjective symptom testimony.

C. **ISSUE THREE: Plaintiff's GAF Scores.**

Plaintiff contends that the ALJ "improperly failed to consider" Plaintiff's GAF scores.  (JS at 36.)  Plaintiff acknowledges the existence of cases "that indicate the failure to consider a GAF is not reversible error," but distinguishes Plaintiff's case as one in which "the GAF scores were pointed out to the ALJ, and the ALJ should have considered this evidence because the ALJ was put on notice to consider it."  (JS at 37.)  Plaintiff concludes that the ALJ was required to indicate in his written decision the amount of weight he gave to Plaintiff's GAF scores.  (Id.)

In support of this argument, Plaintiff cites Gattis v. Colvin, No. CV. 15-03271, 2016 U.S. Dist. Lexis 9742, *12-15 (C.D. Cal. Jan. 27, 2016).  In Gattis, the ALJ's mental RFC assessment rested on the opinion of state agency medical consultant Dr. Patterson.  Dr. Patterson failed to discuss the GAF scores in the medical records she reviewed, even though the VE testified that a GAF score as low as the claimant's would preclude all work.  The district court held that "Dr. Patterson's RFC assessment is not supported by independent evidence and cannot serve as substantial evidence."  Id.

Gattis did not hold that ALJs must discuss GAF scores in their written decisions.  Failing to discuss GAF scores is generally not reversible error.  Hughes v. Colvin, 599 F. App'x 765, 766 (9th Cir. 2015) ("The ALJ did not err in failing to address Dr. Caverly's GAF score, because a GAF score is merely a rough estimate of an individual's psychological, social, or occupational functioning used to reflect an individual's need for treatment, but it does not have any direct correlative work-related or functional limitations"), citing Vargas v. Lambert, 159 F.3d 1161, 1164 n. 2 (9th Cir. 1998); see also Bayliss v. Barnhart, 427 F.3d 1211,

1217 (9th Cir. 2005) (affirming ALJ finding of non-disability where record contained GAF scores of 40).

Plaintiff's argument that this is a unique case because her low GAF scores were "pointed out" to the ALJ also fails. The Court could meaningfully review the administrative decision-making process without the ALJ's having assigned a specific weight to Plaintiff's GAF scores. As discussed above, the ALJ found that Plaintiff's reported activities (e.g., taking college classes, going out alone, taking the bus, shopping, and walking in public for exercise) were inconsistent with the extreme limitations in Dr. Pickart's mental assessment form and Plaintiff's subjective symptom testimony. The ALJ also apparently viewed Plaintiff's low GAF scores as inconsistent with her reported activities.

D. **ISSUE FOUR: Plaintiff's Edema.**

Plaintiff argues that the ALJ erred by not explaining "how edema significantly limited [Plaintiff's] work abilities." (JS at 41.) Plaintiff suggests that the ALJ should have incorporated into Plaintiff's RFC the need to elevate her legs for two hours every day to reduce edema. (JS at 38, citing hearing testimony at AR 67-69 [Plaintiff typically elevates her legs for two hours/day but does not take medication to address edema]). Plaintiff cites medical evidence from 2014 mostly (but not universally) noting "1+" edema.[6] (JS at 40.)

The Commissioner responds that the RFC is supported by substantial evidence, because the medical evidence showed episodic edema with no need for consistent leg elevation. The Commissioner characterizes AR 775 ["history of edema"] and AR 780 ["edema has improved since stopping" Depakote] as showing that Plaintiff's edema "fully resolved when she stopped taking one of her medications in 2016." (JS at 40.)

---

[6] See https://www.healthline.com/health/pitting-edema#diagnosis describing edema rating scale of 1 (least serious) to 4 (most serious).

### 1. Summary of Relevant Administrative Proceedings.

The ALJ found that Plaintiff's "bilateral lower extremity edema" was a severe impairment. AR 17. The ALJ restricted Plaintiff against standing or walking for more than six hours during an eight-hour workday. AR 19. The ALJ's RFC did not include any allowance for Plaintiff to elevate her legs while working. At the second hearing, the VE testified that if Plaintiff had to elevate her legs 24 inches for an hour each workday, that would not preclude work as an assembler, DOT 734.687-018, because it is a sedentary job and her legs would not be above the work table. AR 45-47. In contrast, if she had to elevate her legs waist high "so that she'd have to recline to some extent," that would preclude doing that job. AR 47. The VE at the first hearing was not asked about leg elevation.

The assembler position, however, is not one of the jobs that the ALJ ultimately found Plaintiff could do. <u>Compare</u> AR 47 and 26 (discussing "bench assembler" position identified by a different DOT code). Even if the VE's reasoning would apply equally to the "bench assembler" job, that position appears inconsistent with the RFC's restriction against fast-paced assembly work, per <u>Randazzo v. Berryhill</u>, 725 F. App'x 446, 447 (9th Cir. 2017). The VE did not address whether leg elevation was compatible with the automated machine attendant or laundry worker positions, both of which are "medium" work. AR 26.

### 2. Chronological Summary of the Medical Evidence.

• 1/31/14 (AR 284): Plaintiff complained of swelling in her legs and ankles "for years." She thought it was due to "psych meds" but observed that her symptoms continued when off of medication. Her treating source did not observe pitting, and Plaintiff was able to ambulate, sit, and stand. The treating source advised Plaintiff to continue elevating her legs as needed.

• 3/13/14 (AR 283): Plaintiff was "seen for BLE [both lower extremities] edema for years. States worsens when on feet for long period of time. … Resolves when elevating [legs]." Recommended treatment was ibuprofen, extra

towel to elevate legs, and compression stockings.

• 5/15/14 (AR 502): Plaintiff complained of leg swelling but elevation helped. The doctor observed "1+ pitting edema" affecting both legs and wrote, "patient adamant of needing a water pill today." The doctor prescribed furosemide, a diuretic sold under the brand name Lasix, with a dosage of 20 mg/day.

• 6/14/14 (AR 501): A physical examination revealed "(+)1 pedal edema." Furosemide 20 mg was still listed as one of Plaintiff's medications.

• 7/30/14 (AR 506-11): Plaintiff told the consultative examiner that she was taking furosemide and had a "history of edema involving her upper and lower extremities." AR 506-07. She had been "on Zyprexa," stopped taking it several months earlier, and noticed "a gradual improvement in the edema." AR 506. The examiner saw "no edema" affecting any of her extremities. AR 509.

• 10/22/14 (AR 590): "Had work up for edema legs ... placed on Lasix ... Lasix 60 mg was helpful." The doctor observed, "Edema is present" and refilled her Lasix prescription for 80 mg/day. AR 593. Plaintiff reported that she had been on 60 mg, but it did not work, so the dosage was increased to 80 mg. AR 594.

• 11/17/14 (AR 584): Plaintiff reported compliance with her prescribed furosemide 80 mg. AR 585. The doctor observed, "Edema is present." AR 587.

• 12/2/14 (AR 579): Plaintiff reported "less swollen legs" and "no active problems." She was still prescribed furosemide 80 mg, but she indicated that she was no longer taking it. AR 577. The doctor observed 1+, non-pitting edema affecting both legs. AR 579. The treatment plan included counseling Plaintiff to restrict her fluid intake and take furosemide, although her dosage was reduced back to 20 mg/day. AR 581-82.

• 1/12/15 (AR 680): Plaintiff was still prescribed furosemide 20 mg, but she was not taking it. AR 681-82. Plaintiff's physical examination revealed all "normal" findings and she reported pain at a level of 0/10. AR 685.

1  • 1/16/15 (AR 645):  Plaintiff reported that taking Zyprexa in the past had

2  caused "BLE edema."

3  • 4/24/15 (AR 689):  Plaintiff complained of pain caused by a bunion on her

4  right foot.  AR 692.  She was not taking furosemide although it was still

5  prescribed.  AR 691.  The physical exam did not mention edema.  AR 692.

6  • 10/6/15 (AR 694):  Plaintiff had "no edema" and was not taking

7  furosemide.  AR 695, 697.  Her doctor stopped her furosemide prescription.  AR

8  695.

9  • 12/15/15 (AR 702):  Plaintiff had "no edema."  AR 705.

10  • 3/18/16 (AR 773):  Plaintiff told Dr. Pickart that she "recently had

11  appointment with nephrologist due to edema; was told that edema could be [side

12  effect] of psych meds.  [Plaintiff] reports that did not have edema until started

13  Depakote; reviewed [side effects] of med with member and agreed that as

14  possible."  Dr. Pickart discontinued her Depakote prescription.

15  • 4/15/16 (AR 780):  Plaintiff reported "BLE edema has improved since

16  stopping" Depakote.

17  • 6/24/16 (AR 827):  Plaintiff had "no edema."  AR 831.

18  • 9/2/16 (AR 799):  Plaintiff reported that her only medication side effect

19  was increased appetite.

20  • 10/14/16 and 11/4/16 (AR 807, 812):  Plaintiff again reported that her only

21  medication side effect was increased appetite.

22  • 1/24/17 (AR 837):  Plaintiff had "no edema."  AR 840.

23  • 3/8/17 (AR 68-69):  Plaintiff testified that she must lay down and elevate

24  her feet for two hours/day to avoid her legs becoming "very painful."

25  **3.  Analysis of Claimed Error.**

26  The ALJ's decision not to incorporate leg elevation into Plaintiff's RFC is

27  supported by substantial evidence.  The above-summarized medical evidence

28  shows that (1) Plaintiff experienced edema in early 2014, (2) when Plaintiff

complained to her doctor, she received a furosemide prescription with a dosage that increased over several months, (3) by mid-2014, her condition had improved, such that the consultative examiner saw no edema, (4) by early 2015, Plaintiff reported no edema and had stopped taking furosemide, (5) Plaintiff was largely free of edema through 2015, (6) Plaintiff began experiencing edema again in early 2016, at which point Dr. Pickart discontinued her Depakote prescription and her edema improved until she had no edema by June 2016. The ALJ reasonably concluded that this evidence of medication-related, episodic edema that responded well to a prescription diuretic did not justify including an accommodation for leg elevation (beyond what Plaintiff could do during regular work breaks) in the RFC.

E. **ISSUE FIVE: The VE's Testimony.**

The VE testified that Plaintiff could work as a laundry worker. AR 40. The DOT describes that job as follows:

> Tends laundering machines to clean articles, such as rags, wiping cloths, filter cloths, bags, sacks, and work clothes: Loads articles into washer and adds specified amount of detergent, soap, or other cleaning agent. Turns valve to fill washer with water. Starts machine that automatically washes and rinses articles. Lifts clean, wet articles from washer and places them successively into wringers and driers for measured time cycles. Sorts dried articles according to identification numbers or type. Folds and places item in appropriate storage bin. Lubricates machines, using grease gun and oil can. May dissolve soap granules in hot water and steam to make liquid soap. May mend torn articles, using needle and thread. May sort and count articles to verify quantities on laundry lists. May soak contaminated articles in neutralizer solution in vat to precondition articles for washing. May mix dyes and bleaches according to formula, and dye and bleach specified articles.

21

(DOT 361.685-018.)

Plaintiff argues that the VE's testimony that a person with Plaintiff's RFC could do this work conflicts with the DOT's description, such that the ALJ erred by relying on the VE's testimony without obtaining clarification. (Dkt. 25 at 4.) Plaintiff argues that "common experience" suggests this type of work must be performed in a "rapid or fast-paced" environment. (Id.)

The Court sees no apparent conflict between the VE's testimony and the DOT, such that the ALJ had no duty to inquire further. Activities such as loading dirty clothes into a washing machine, adding soap, starting the machine, mending torn articles, and soaking stains are generally not performed on an assembly line and need not be performed rapidly to keep pace with other workers.

## IV.

## CONCLUSION

For the reasons stated above, IT IS ORDERED that judgment shall be entered AFFIRMING the decision of the Commissioner.

DATED:  August 16, 2019

KAREN E. SCOTT
United States Magistrate Judge